Filed 10/23/15  P. v. Gerhartsreiter CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B251546 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA078321) |
| v. | |
| CHRISTIAN K. GERHARTSREITER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  George Lomeli, Judge.  Affirmed in part; reversed in part and remanded.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1985, John Sohus and his wife Linda went missing. John Sohus's dismembered remains were unearthed in 1994. Linda Sohus was never found. Defendant Christian K. Gerhartsreiter, who had been living under a number of socially vaunted false identities, was arrested for John Sohus's murder in 2011. In 2013, a jury found defendant guilty of first degree murder. Two deadly and dangerous weapon allegations were found true. Defendant was sentenced to 27 years to life in state prison, including an indeterminate term of 25 years to life for the murder, and one year for each deadly weapon enhancement.

Defendant appeals, claiming insufficiency of the evidence of premeditation and deliberation for the first degree murder conviction, prosecutorial misconduct, and sentencing errors. Defendant does *not* contend insufficient evidence supports his conviction of murder; he only claims he should not have been convicted of murder in the first degree. As to the sentencing errors, he contends that two deadly weapon enhancements cannot be imposed, that he erroneously was denied conduct credits, and that a parole revocation fine was erroneously imposed. Respondent concedes error as to the parole revocation fine, the enhancements, and the exclusion of conduct credits, but argues that defendant received custody credits to which he was not entitled.

We agree that defendant's custody credits were not properly calculated, and remand the case so the trial court can make the necessary factual findings. We also stay one deadly weapon enhancement, and strike the parole revocation fine. We otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

The appellate record reads like pulp fiction, but tells the tragically true story of defendant's brutal murder of his neighbor, and of the tangled web of deceit by which he avoided arrest for 26 years. Defendant lived a life of elaborate lies under many different identities, both before and after the murder of John Sohus. He was a chameleon-like social climber who at various times claimed to hobnob with celebrities like George Lucas, to be an English baron, and to be a member of the Rockefeller family. The prosecution introduced a great deal of evidence of defendant's various alter egos, calling

2

numerous witnesses to testify at length about defendant's many personas and sophisticated techniques to cover his tracks and conceal his true identity. Bearing in mind the limited scope of this appeal, which does not challenge the correctness of defendant's conviction of murder, we limit our recitation of the evidence to that which is relevant to the principal contention, that there was insufficient evidence of premeditation and deliberation.

## I.        Defendant Leaves Germany for the United States

Defendant grew up in Bergen, Germany, in a blue collar family. In 1978, he came to the United States as a foreign exchange student on a student visa. He attended his senior year of high school in Berlin, Connecticut, and lived with the Savio family. Edward Savio, the son of the host family, attended high school with defendant, and the two became friends. According to Savio, even as a youth, defendant told a lot of "stories," often varied his speech and accents, and acted differently depending on the person with whom he was socializing. Defendant told Savio that he came from a wealthy family, and that his father was an "industrialist." During his time with the Savio family, defendant generally used his real name, but also went by Christopher Kenneth Gerhart.

Following high school, defendant attended the University of Wisconsin. Defendant registered using his real name. He met Elaine Siskoff in 1980, introducing himself as Christopher Gerhart. He also went by Christopher Gerhartsreiter Chichester, telling Ms. Siskoff that Chichester was a family name. They dated from the fall of 1980 to the spring of 1981, when defendant left the university, telling Ms. Siskoff that he was going to California to pursue an internship with the film director George Lucas. She only heard from defendant once after he left for California. He sent her a postcard, saying he was in England. The card appeared to bear a Great Britain postmark, dated January 23, 1982.

However, defendant was not then in England. In 1981, after leaving Wisconsin, defendant rented Ruth Sohus's guesthouse on the property she owned at 1920 Lorain Road in San Marino, California. Ms. Sohus lived in the property's main house. Defendant was going by the name Christopher Chichester at the time.

Defendant became a parishioner at the Church of Our Saviour in San Gabriel, and made a number of acquaintances there, representing that he was a film student at the University of Southern California (USC). Defendant talked about using the name "Chris Crowe" to work as a screenplay writer.

Dana Farrar met defendant in 1984. Ms. Farrar studied journalism at USC. Her aunt, a San Marino resident, introduced her to defendant, thinking that defendant could help Ms. Farrar's boyfriend get into film school at USC. Defendant introduced himself as "Christopher Chichester, the 13th Baronet." He told Ms. Farrar he was from South Africa, and gave her a business card with that false name and a crest on it. He portrayed himself as wealthy. During this same period of time, defendant told others he was British, and that he ran the Chichester family trust.

## II.     Disappearance of John and Linda Sohus in February 1985

John Sohus was Ruth Sohus's adult son. He married Linda Mayfield in 1983, and by all accounts, they had a happy relationship. Following their marriage, they moved into the main house with Mr. Sohus's mother because they were going through an "economic slump." At the time, defendant was still living in the guesthouse on the property. Mrs. Sohus told a neighbor that she and her husband did not talk to defendant "because he's kind of creepy."

Things soon started to turn around for the couple, and Mrs. Sohus, who was trying to make her way as an artist, began to experience some success. In January 1985, she had an art show and sold some of her pieces. The couple also bought a new pickup truck. In late January 1985, the couple visited with Mr. Sohus's longtime friend, Patrick Rayermann, and told him they intended to move, but wanted to stay nearby, given the advancing age of Mr. Sohus's mother. Mr. Rayermann did not sense any stress or conflict between John and Linda Sohus. After this visit, Mr. Rayermann never heard from them again.

In late January or early February 1985, the couple went to Susan Coffman's home to show her their new pickup truck. Mrs. Sohus and Ms. Coffman were longtime friends.

4

The couple told Ms. Coffman that they were planning to move. They appeared happy and discussed attending a science fiction convention with Ms. Coffman in March.

Two weeks later, Mrs. Sohus called Ms. Coffman and told her that she and her husband were going on a trip to New York. When Ms. Coffman asked why, Mrs. Sohus told her, "Well, John's got a job with the government, and I can't talk much about it. I can't say much of anything. But we are going. And they might want me, too." When Ms. Coffman reminded Mrs. Sohus about the science fiction convention they had planned to attend together, Mrs. Sohus said they would be back in two weeks "to get all our stuff and pack everything up," in time to attend the convention. But after this conversation, Ms. Coffman never heard from either Mr. or Mrs. Sohus again, except for a single postcard she received. Before this last conversation with her old friend, she had never heard Mrs. Sohus mention government work.

In late January or early February 1985, Mrs. Sohus had a telephone conversation with Gary Traveis, who had purchased some of her art. She told Mr. Traveis that she and her husband were travelling to New York because they had both accepted "top secret" government jobs, working with satellites. She promised to contact him once they were in New York.

Mrs. Sohus visited her mother on February 8, 1985, and told her that she and her husband were leaving town for two weeks to see about a job opportunity for Mr. Sohus in Connecticut, working with computers. Mrs. Sohus asked if she could park the couple's truck at her mother's house during the trip, but her mother said no, because she did not want to have to move the truck on street cleaning days. Mrs. Sohus made plans with her mother to see the play "Cats" upon her return. But her mother never heard from Mrs. Sohus again.

Mrs. Sohus worked at a bookstore. She was a pleasant and reliable employee. In late January or early February 1985, her boss, Lydia Marano, asked her to open the store for the next few days. When Ms. Marano stopped by the store on one of those days, she found it was closed. She was surprised because Mrs. Sohus was so reliable. Ms. Marano

never spoke with or saw Mrs. Sohus again. Days before Ms. Marano had asked Mrs. Sohus to open the store, Mrs. Sohus had told her that she and her husband were soon going on a top secret mission.

In March 1985, Mrs. Sohus's sister discovered that Mrs. Sohus had never retrieved her cats from the kennel where she had been boarding them. Mrs. Sohus loved her cats; they were like her children. Therefore, her sister suspected something was wrong and made a missing person report on April 8, 1985.

In May 1985, Mrs. Sohus's mother received a postcard purportedly from Linda. It was postmarked April 29, 1985 from France. The postcard simply read, "Mom, I think we need a geography lesson, but not too bad – Linda & John." Her mother understood the card to mean that Mr. and Mrs. Sohus had traveled to France rather than Connecticut. The card was out of character for Mrs. Sohus; ordinarily, she would have said more to her mother about her trip. Moreover, Mrs. Sohus had never mentioned plans to travel to Europe, and did not have a passport or the financial means to make such a trip. DNA found on the postcard's stamp contained two profiles, one of an unknown man, which was not either Mr. Sohus or defendant. There was insufficient DNA information to identify the other contributor, or to exclude Mrs. Sohus as a contributor.

Ms. Coffman also received a postcard purporting to be from Mrs. Sohus, also postmarked in France on April 29, 1985. The postcard read, "Hi, Sue. Kind of missed New York. Oops, but this can be lived with. John and Linda." Ms. Coffman believed the postcard's brevity was out of character for her friend, who Ms. Coffman believed would have told her why she was in France. Ms. Coffman was also surprised because Mrs. Sohus never mentioned plans to travel overseas, and she and her husband did not have the financial resources to do so. DNA from the stamp came from an unknown male; Mr. Sohus and defendant were excluded as possible donors.

Mrs. Sohus's employer, Ms. Marano, also received a postcard from France, which stated "Hi Lydia. Not quite New York, but not bad. See you later, Linda and John."

Ms. Marano was perplexed by the postcard because Mrs. Sohus did not have money to travel to France, and had never mentioned any plans to travel there.

Ms. Marano received a phone call from the May Company, sometime over the years between 1985 and 1994, asking for a job reference for "Linda Mayfield," and she also received a call asking for a credit reference for Mrs. Sohus. Ms. Marano "couldn't believe" she would receive these calls asking for positive references, since Mrs. Sohus had abandoned her job, and left her in the lurch.

Following their disappearance, Mr. Sohus's mother kept their room intact. There was no indication the couple had packed for a long trip. Mr. Sohus's insulin for his diabetes and medical supplies were still in the couple's bathroom. All of their possessions, including Mrs. Sohus's art and art supplies, were still at home. Mr. Sohus's mother eventually placed her home on the market in November 1985.

## III.    Defendant's Conduct After the Disappearance

Near the time of the Sohuses disappearance, defendant asked one of his acquaintances from church where he could dispose of "some drums of chemicals." The acquaintance assumed defendant wanted to dispose of photography chemicals related to his studies at USC and told him there were plenty of places in the Angeles and San Bernardino National Forests.

A week or two after this conversation, defendant offered to sell a few items to this same acquaintance. One of the items was an oriental rug. When the acquaintance's wife inspected the rug, she noticed a blood stain. She told defendant, "there's spots on this rug, there's a blood spot on there." Defendant did not deny the stain was a blood stain. He simply rolled up the rug and put it back in the truck he was driving.

In the early spring of 1985, a neighbor of the Sohus family noticed a "foul, awful smell" and black smoke coming from the chimney of the guest house. When the neighbor called defendant to complain about the odor, and asked what he was burning, defendant said he was burning carpet. The neighbor cautioned defendant that she was considering calling the fire department, and the burning stopped 10 minutes later.

7

In the spring of 1985, defendant let Jeffrey Bender, a graduate student at USC's film school, borrow the victims' truck. Mr. Bender used the truck for a couple of months, until April or May 1985. He returned the truck to defendant after defendant demanded payment for its use, even though they had never discussed Mr. Bender paying to use the truck. Defendant never told Mr. Bender the truck belonged to someone else.

Between mid-May and June 1985, Dana Farrar, whose aunt had introduced her to defendant in 1984, attended a social event at defendant's home. Defendant walked freely into the main house to get supplies for the gathering. When Ms. Farrar asked why defendant was entering his landlord's home, defendant responded "They are away, they will not mind." Ms. Farrar also noticed a bare patch of earth behind the guesthouse, which had recently been dug up. The area was near a concrete slab, was two to three feet wide, and five to eight feet long. Ms. Farrar asked defendant about the dirt, and he said he had been having plumbing problems. After the party, Ms. Farrar never saw defendant again.

## IV. Initial Investigation in 1985

On April 8, 1985, San Marino Police Officer Thomas Leveque took the missing person report from Mrs. Sohus's sister. Officer Leveque did a records search in various databases for Mr. and Mrs. Sohus, and only found the Lorain Road address associated with them. He visited 1920 Lorain Road and spoke with Mr. Sohus's mother, who was alone at the property.

On April 16, 1985, Officer George Yankovich visited Lorain Road, and knocked on the door of the guesthouse. Defendant answered the door, naked. When Officer Yankovich asked him to put on some clothes, defendant refused, telling the officer he was a "nudist." Defendant said his name was Christopher Chichester. When Officer Yankovich returned to the station, he ran a check on defendant in the California Law Enforcement Telecommunications System (CLETS) database. He discovered that defendant had a California driver's license under the name of Christopher Chichester, and

8

also had an "aka" of Christian Gerhartsreiter listed with the Department of Motor Vehicles.

In July 1985, San Marino Police Officer Lili Haidsell conducted a CLETS search for the Sohuses' 1985 Nissan truck. The truck was still registered to Mrs. Sohus at the Lorain Road address. Officer Haidsell flagged the car in the system, noting it was connected to a missing person.

## V.       Defendant Leaves Town

In May 1985, defendant told one of his acquaintances from church, William Stewart, that he was returning home to Connecticut because of a family problem. Mr. Stewart replied that he also planned to travel back east, but defendant refused to share any east coast contact information with him. Defendant had borrowed a chainsaw from Mr. Stewart in late January 1985, and he returned it shortly after this conversation in May 1985. Mr. Stewart never heard from defendant again.[1]

Defendant applied for a post office box in Greenwich, Connecticut, on June 12, 1985, using a driver's license in the name of "Christopher Crowe." The driver's license identified defendant's address as 34 Rockridge Road in Greenwich. Defendant specified "C. Mountbatten" as an additional authorized user of the post office box. He regularly used the box from 1985 until 1988, but stopped paying for it in February 1989.

---

[1]     The chainsaw was eventually turned over to police, after the discovery of John Sohus's body. There was no evidence at trial that the chainsaw was used to dismember Mr. Sohus. Nevertheless, the prosecutor represented, and the trial court agreed, that the chainsaw evidence was relevant "to show that at the time these actions were all occurring in 1985, the defendant's mental state was such that he was trying to figure out how to dispose of things such as bodies by asking about drums of chemicals, by borrowing chain saws, which he normally wouldn't use in his normal habits and customs." In fact, witnesses testified they never saw defendant operating power tools or doing any sort of physical labor, not even gardening.

Between 1985 and 1988, defendant held a number of jobs in Connecticut and New York, working under the name Christopher Crowe.

He disposed of the Sohuses truck by giving it to an acquaintance, Chris Bishop, who attempted but was unable to register the truck, because it had a lien on it. Mr. Bishop abandoned the truck because he was unable to obtain title to it.

Defendant started a romantic relationship with a coworker, Mihoko Manabe, and moved into her Manhattan apartment.

## VI. Investigation Resumed in 1988

After the police initially investigated the Sohuses disappearance, the case went cold. In the fall of 1988, Officer Yankovich had been promoted to detective, and decided to reopen the investigation.

Detective Yankovich conducted a CLETS search for the couple's truck, and discovered that the truck was associated with the Bishop family in Greenwich, Connecticut. Detective Yankovich contacted the Greenwich Police Department, and asked Detective Daniel Allen to follow up with the Bishops. He also informed Detective Allen that the San Marino Police Department was looking for a person going by "Chichester" or "Gerhartsreiter."

In early November 1988, Detective Allen drove to the Bishop family's home, and spoke with Chris Bishop. He told Mr. Bishop he was looking for a specific truck, and that the truck was associated with a missing person report. Mr. Bishop stated his friend, Chris Crowe, owned such a truck, and provided Detective Allen with an address. Detective Allen attempted without success to locate defendant at the given address.

After Detective Allen's visit, defendant called Mr. Bishop and asked him what was going on. Mr. Bishop told defendant, "What's going on is a detective just showed up at my house and said you're wanted for a missing person investigation. Who the f--- are you really?" Defendant responded, "I gotta go," and hung up the phone. Mr. Bishop did not hear from him again.

In mid-November 1988, Detective Allen discovered a post office box registered to Christopher Crowe. Detective Allen was also able to identify defendant's employers. He contacted defendant's current employer, Ralph Boynton at Kidder Peabody, an investment firm on Wall Street in New York City. Mr. Boynton provided Detective Allen with three phone numbers for defendant. Detective Allen told Mr. Boynton that he was interested in meeting with defendant. Mr. Boynton arranged a meeting, telling defendant to come to his office at 6:00 a.m. Mr. Boynton did not tell defendant that Detective Allen would attend the meeting. Nevertheless, defendant did not show up. Mr. Boynton arranged two other meetings, but defendant failed to show up for both meetings. Defendant explained that he was worried about his parents being kidnapped by a foreign entity. Defendant never showed up for work again.

One of the phone numbers Mr. Boynton gave Detective Allen was for defendant's girlfriend, Ms. Manabe. In late November 1988, Detective Allen called Ms. Manabe's home, and asked to speak with Christopher Crowe. Ms. Manabe took a message and gave it to defendant. Defendant told her not to disclose his whereabouts, that Detective Allen was not a real police officer, and that defendant's life, and the lives of his parents, were in danger. Defendant asked Ms. Manabe to marry him, and to go into hiding with him in Europe. She agreed to go along with his plan because she loved him.

In November 1988, defendant informed the Greenwich post office that he would be closing his box. He never again went back to the box to retrieve his remaining mail.

Detective Allen informed Detective Yankovich that he was unable to make contact with defendant. Detective Yankovich did not ask Detective Allen to make any further efforts, so Detective Allen treated the case as closed.

## VII.   Defendant's Evasion of Law Enforcement

According to Ms. Manabe, defendant decided not to flee to Europe. Instead, he changed his appearance, wearing contact lenses, and changing his hair color. Defendant engaged in other paranoid behavior. He left his job, would not be seen in public with Ms. Manabe, stopped driving, never filled out official documents in his name, shredded

11

the couple's garbage and disposed of it in public places. All bills, leases, and accounts were in Ms. Manabe's name. Defendant received secondary credit cards on Ms. Manabe's accounts in the name of Clark Rockefeller, a name he started using in the summer of 1989. This behavior continued until the couple ended their relationship in 1994.

## VIII. Discovery of John Sohus's Body

Robert Parada purchased the Lorain Road property from Ruth Sohus in December 1985. On May 4, 1994, excavation contractors Jose Perez, his father, and his brother were digging a swimming pool at the Lorain Road property. While Mr. Perez was digging with a Bobcat, he hit and broke a large fiberglass container about two or three feet underground. There were several trash bags inside the container. Mr. Perez's father dragged one of the bags to the side of where they were digging, and poked at it with a piece of rebar. He discovered a skull in the bag, and noticed other bones. The men stopped digging and called police. San Marino Police Officer Joe Lucero responded to the Lorain Road property and observed human remains in bags scattered near the container.

Mr. Perez had dug hundreds of pools in the San Marino area. He estimated that using a shovel and pickax, it would take him approximately seven hours to dig a hole big enough and deep enough to accommodate the fiberglass container.

The remains were in the same area where Ms. Farrar had noticed disturbed earth in 1985. There were no pipes or plumbing in this area of the property. The area where the remains were found was not visible from the front house; the guest house blocked the view of this area of the yard.

Physical anthropologist Judith Daye examined the excavation area. She designated Site A as the area where the bag containing the skull was located. Site B was the fiberglass drum. Inside the drum was the lower half of a human body in jeans. A pair of shoes was found under the drum. The area to the left of the drum was designated as

12

Site C, and included plastic bags containing a human torso covered in a shirt. Ms. Daye collected the evidence and transported it to the Los Angeles Coroner's Office.

Senior criminalist Manuel Munoz with the Coroner's Office separated the physical evidence from the human remains. The Site A evidence included two plastic bags, one inside the other, that contained skull fragments and a column of hair. The Site B evidence included the fiberglass container which held a pair of jeans wrapped in cellophane, with bones within the jeans. There was also a pair of socks, and a pair of shoes wrapped in plastic paper. Site C included two plastic bags, each containing a hand. A shirt, containing arm and torso bones, was wrapped in plastic wrapping paper.

Forensic scientist Lynne Herold, with the Los Angeles Sheriff's Department, determined that the fiberglass drum was buried three feet from the surface of the ground. The Site A bags included a "University Book Store at Milwaukee . . . Wisconsin" bag, which was the type of bag used at the bookstore at the University of Wisconsin at Milwaukee from 1979 to 1982. The second bag was a "Trojan Stores, U.S.C." bag which was the same design as the bags used by the USC bookstore from 1979 to 1984.

Ms. Herold examined the shirt found with the remains. The long-sleeved shirt had at least six 1-inch cuts caused by a knife or box cutter. There were four cuts on the back of the left shoulder, and the other two were on the back of the left sleeve near the elbow. Ms. Herold believed the cuts were either inflicted from behind or from the front if the victim's arm had been raised. The cuts existed before the body decomposed, and were not caused by roots, the Bobcat, or any mishandling of the remains.

Ms. Herold also examined the guesthouse at the Lorain Road property for the presence of blood. She lifted the carpet and padding in the main living area, and did not see any blood. But when she used luminol, and later used the Kastle-Meyer test, she confirmed the presence of four large blood stains on the slab floor. Three of the bloodstains had wiping marks, which occur when someone dilutes or wipes away wet blood. The evidence was consistent with someone attempting to clean up the blood. DNA testing was not feasible, so no samples were collected.

13

The parties stipulated that the remains belonged to John Sohus.  The parties also stipulated that Dr. Robert Mann, a forensic anthropologist, reconstructed the skull fragments and determined that skull fractures to the right parietal area and the frontal bone of the skull were caused by severe blunt force trauma.  The parietal damage was inflicted before the frontal damage, and each blow was inflicted at or before the moment of Mr. Sohus's death.

Forensic pathologist, Dr. Frank Sheridan, reviewed the coroner's findings, and also examined the skull.  He found two fractures near the forehead area of the skull, and extensive fracturing near the right parietal area, caused by at least two impacts to the parietal area.  All of the fractures were inflicted at or about the time of death, and were inflicted with a blunt object with major force.  Any of the blows would have incapacitated Mr. Sohus or rendered him unconscious, and would have caused external and internal bleeding.  Mr. Sohus died of blunt force trauma to the head.

IX.    **Defendant's Continued Evasion of Law Enforcement**

In February 1993, defendant met Sandra Boss at a party in New York City, introducing himself as Clark Rockefeller.  Ms. Boss was studying for an MBA at Harvard Business School.  The two maintained a long-distance romantic relationship over the next year and a half.  According to Ms. Boss, defendant always wore hats in public and explained that he had a high need for privacy because of his famous family.  Defendant also told Ms. Boss he was "involved in secretive government . . . work" doing third-world debt renegotiations.  Defendant also represented that he had started a company focused on space travel and military projects, and that he had special expertise in satellites.

Defendant proposed to Ms. Boss in 1994.  She accepted and moved into his New York City apartment (which defendant told her he was subletting from Ms. Manabe).  Ms. Boss started work at a management consulting firm.  Defendant went to great lengths to protect his privacy, including using credit cards from Ms. Boss's accounts, as he had done during his relationship with Ms. Manabe.

In October 1995, defendant and Ms. Boss were married at a Quaker meeting house in Massachusetts. Defendant represented that he had taken care of all the paperwork to make the marriage legal. In fact, however, he did not.

Ms. Boss supported the couple financially during their marriage, but defendant controlled their money. Leases and title to the couple's properties were always in Ms. Boss's name. Once airlines started requiring identification from passengers, defendant never flew again. He also refused to stop in Connecticut on car trips between Boston and New York.

The couple had a daughter together in May 2001.

During this time, defendant introduced himself to others as Clark Rockefeller, and said he owned Propulsion Physics Laboratory in Canada, and that his company had built a satellite.

Ms. Boss was unhappy in the relationship because defendant did not work and was generally unpleasant. In 2004, she told defendant she wanted to leave him. He threatened that she would never see their daughter again if she left. Ms. Boss finally left defendant in 2007, initiated divorce proceedings, and obtained custody of their daughter. In August 2007, during the divorce, Ms. Boss discovered that Clark Rockefeller was not his real name. At the time, they were living in Boston.

## X.  Defendant's Arrest

On August 2, 2008, defendant was taken into custody in Baltimore, Maryland, for kidnapping his daughter. He was transported to Boston, Massachusetts, where he was formally arrested. At the time of his arrest, he was using the name Chip Smith. After his arrest, defendant told Massachusetts authorities his name was Clark Rockefeller. His true identity was discovered based on his fingerprints.

Defendant's arrest drew media attention. On August 26, 2008, he granted an interview to Natalie Morales for The Today Show. He told Ms. Morales he "believe[d]" his real name was Clark Rockefeller. He said he had a few childhood memories of growing up in the United States, but did not have any "clear memor[ies]" of his parents. He was "quite sure" that he grew up in New York City. Defendant denied his name was

15

Christian Gerhartsreiter, and denied having any connection to Germany. He admitted using the name Christopher Crowe while working on Wall Street. When asked if he killed John and Linda Sohus, defendant responded, "My entire life I've always been a pacifist. I'm a Quaker and . . . I believe in non-violence. I can fairly certainly say that I've never hurt anyone, physically."

After defendant's true identity was discovered, the Los Angeles County Sheriff's Department reopened its investigation. The sheriff's department conducted an extensive search of all available law enforcement and public databases to locate Linda and John Sohus, such as arrests, convictions, driver's licenses or identification cards, updated address or contact information, registration of vehicles, credit inquiries, employment, and found no information for them, since 1985. Also, there were no customs records showing that they entered or left the United States from January 1, 1985, until the time of trial, or that they ever applied for or received any passports.

The Sheriff's Department executed a search warrant at a storage facility in Baltimore. The storage unit contained a number of letters, bills, credit cards, and checkbooks, bearing the name of Clark Rockefeller. There were also 24 unused postcards, preserved in plastic sleeves, from various destinations. The Sheriff's Department also obtained defendant's German passport. The passport did not have any record of defendant traveling internationally after entering the United States on his student visa in 1978.

## XI.     Defense Evidence

Defendant presented the testimony of two forensic document examiners, who opined that the postcards sent to Ms. Coffman, Mrs. Sohus's mother, and Mrs. Sohus's employer were written by Mrs. Sohus.

## DISCUSSION
## I.     Sufficiency of the Evidence of Premeditation and Deliberation

Defendant contends the evidence was insufficient to support the jury's finding of premeditation and deliberation for a first degree murder conviction. We disagree.

16

" 'In reviewing the sufficiency of evidence . . . , the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] . . . 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must . . . presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.] The same standard also applies in cases in which the prosecution relies primarily on circumstantial evidence. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) The reviewing court does not reweigh the evidence, evaluate the credibility of witnesses, or decide factual conflicts. (*People v. Culver* (1973) 10 Cal.3d 542, 548.) Nevertheless, "mere speculation cannot support a conviction. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 35.) On the other hand, a finding that "the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment." (*People v. Proctor* (1992) 4 Cal.4th 499, 528-529.)

Penal Code section 189 defines first degree murder as: "All murder which is perpetrated by . . . any other kind of willful, deliberate, and premeditated killing . . . ." First degree murder requires evidence of deliberation, defined as a " 'careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) However, deliberation and premeditation may occur within a very short period of time. (*Ibid.*) "The test is not time, but reflection." (*People v. Bloyd* (1987) 43 Cal.3d 333, 348.) When there is no substantial evidence to support a conviction for first degree murder, the reviewing court must reduce the conviction to second degree murder. (*People v. Anderson* (1968) 70 Cal.2d 15, 23.)

" ' "Generally, there are three categories of evidence that are sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] . . . But these categories of evidence, borrowed from [*People v. Anderson*, *supra*, 70 Cal.2d at pages 26-27] 'are descriptive, not normative.' [Citation.] They are

17

simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.]" [Citation.]' [Citation.] These three categories are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 173.)

We find substantial evidence supports the jury's determination that defendant acted with premeditation and deliberation. The prosecution's theory of the case was that defendant convinced John and Linda Sohus that they were going on a top secret government mission, but after creating the illusion that they were leaving San Marino to start new lives elsewhere, he killed them. Just before their disappearance, John and Linda Sohus spoke to close friends about taking on secret government work in satellites. Neither of them had discussed such work before, but defendant, over the years, told many people he was involved in secret government work involving satellites.

Mrs. Sohus's postcards also provided evidence of planning. The prosecution conceded the postcards may have been written by Mrs. Sohus, but argued that defendant convinced Mrs. Sohus to write the postcards in preparation for her "top secret interview" with the government, and that he arranged for someone else to mail the postcards from abroad. Mrs. Sohus never traveled abroad. She did not have a passport, and customs had no record of her ever leaving the country. DNA on the postcards came from an unidentified male. The plan to use postcards written by Mrs. Sohus, falsely telling family and friends she was in Paris, is similar to defendant's past act of causing a postcard to be sent to a former college girlfriend from whom he wished to conceal his current residence, by telling her first that he was going to California to work with George Lucas, and then sending a postcard from Great Britain telling her he lived in England. In fact, defendant was not in England but had rented Ruth Sohus's guesthouse. Defendant kept a number of postcards, from various destinations, in a storage facility only he had access to.

There was additional evidence of planning. A few months before the Sohuses' disappearance, defendant borrowed a chainsaw from a church friend, and asked another

18

acquaintance from church where he could dispose of drums of chemicals. Defendant returned the chainsaw to his friend about a month after police took Mrs. Sohus's sister's missing person report. The jury could reasonably infer that, as part of the scheme to murder the Sohuses, defendant was planning how to dispose of the Sohuses' remains. Although the prosecution did not try to prove defendant actually used the chainsaw to dismember Mr. Sohus's body, the jury could have reasonably inferred that from the evidence that the lower half of the body was discovered inside a fiberglass drum.

Before his dismemberment, Mr. Sohus was struck at least three times in the head, with great force. There was evidence that he was also stabbed at least six times with either a knife or a box cutter. Defendant's use of multiple weapons to murder Mr. Sohus supports an inference of deliberation, rather than a spontaneous killing, because it shows that defendant had multiple weapons on hand to achieve his objective. (See, e.g., *People v. Combs* (2004) 34 Cal.4th 821, 851 ["the use of multiple weapons . . . reflected deliberation and premeditation rather than the result of a rash, impulsive act"].)

The prosecution theorized that defendant had also killed Mrs. Sohus. The prosecution argued to the jury "you're not here to speculate as to why, today, in these proceedings, he's not charged with Linda's murder. You're here today to decide one issue: did he kill John Sohus? [¶] And it is absolutely proper to consider that Linda Sohus is dead in evaluating all this evidence, and that [defendant] killed her." On this record, the jury could fairly conclude that defendant killed the couple, and secreted their bodies away in different locations, which further supports the finding that Mr. Sohus's murder was premeditated and deliberate. (*People v. Solomon*, *supra*, 49 Cal.4th at p. 815 [the killing of multiple victims supports an inference of premeditation and deliberation].)

Additionally, defendant's dismemberment of Mr. Sohus's body, burying of the dismembered remains, and his elaborate scheme beginning in May 1985, shortly after he returned the chainsaw, to disassociate himself from the Sohus family all support an inference of premeditation.

Post crime evidence, alone, is insufficient to establish that a defendant acted with premeditation and deliberation. However, such evidence may be probative of a

19

defendant's mental state before and during a crime. (*People v. Thompson* (2010) 49 Cal.4th 79, 113 ["evidence of a defendant's post[]crime actions and statements [cannot provide] the sole support for upholding a finding of premeditation and deliberate murder, [but] such post[]crime actions and statements can support a finding that defendant committed a murder for which his specific mental state is established by his actions before and during the crime"]; *People v. Perez* (1992) 2 Cal.4th 1117, 1128 [post crime evidence probative of deliberation and premeditation]; see also *People v. Eggers* (1947) 30 Cal.2d 676, 686 ["the means of disposing of the body, the efforts made to prevent identification, and [defendant's] conduct both prior to and immediately after the crime was committed" supported the jury's conclusion that the crime was premeditated and deliberate]; *People v. Feasby* (1960) 178 Cal.App.2d 723, 731.)

Here, defendant's post crime conduct supports the jury's finding that Mr. Sohus's killing was the result of cool and calm reflection, rather than a rash or impulsive act. Defendant methodically cut Mr. Sohus's body into five pieces, and buried the remains in a hole that would have taken at least seven hours to dig. Most of the remains were placed in a fiberglass drum, like the "drums" defendant had asked about disposing of before the murder.

Defendant briefly remained in town following the Sohuses' disappearance, carrying on as if things were normal. Defendant lent an acquaintance the Sohus's truck, to create the impression that the Sohuses were still alive. He even threw a party at the Sohus residence, where the turned earth from the burial of Mr. Sohus's remains was visible to guests.

However, defendant's subterfuge was not working; people were starting to ask questions. Ms. Farrar asked about the burial site; an acquaintance noticed blood on a rug defendant tried to sell; a neighbor threatened to call authorities when defendant was burning carpet in his fireplace; and the police questioned defendant about the disappearance. Consequently, defendant left town and went to even greater lengths to hide his identity. Defendant changed his physical appearance, changed his name at least three times, and shredded his trash. He took all available steps to stay off the grid

20

(limited as it was at the end of the last century and early 2000s as compared with today), never using any of his aliases on traceable documents but instead relying solely on his various love interests to use their names on leases, utility bills, credit cards, and the likes. And he successfully avoided apprehension for his crime for 26 years.

All of this evidence supports an inference that the killing was methodically planned in advance. Nevertheless, defendant argues there was no evidence that he had a *motive* to kill Mr. Sohus. It is irrelevant that the prosecution presented no specific evidence of motive. Motive is not an element of the offense, and is only a factor that *may* be considered when determining whether the killing was premeditated and deliberate. (See, e.g., *People v. Booker*, *supra*, 51 Cal.4th at p. 173; see also *People v. Orozco* (1993) 20 Cal.App.4th 1554, 1567.)

## II.     Prosecutorial Misconduct

Defendant contends the prosecutor engaged in misconduct during closing argument, when he "maligned" defendant's trial counsel by arguing that counsel had the "gall" to blame Linda Sohus for her husband's death.

During opening statement, defense counsel had argued that Mrs. Sohus was likely her husband's killer, rather than defendant. Anticipating counsel's closing argument would again seek to shift the blame to Mrs. Sohus, the prosecutor argued during closing: "And it struck me, as I was thinking about this case, is it's kind of sad, not necessarily -- I mean, yes, what happened to them is sad, but what struck me as being particularly sad is that not only did the defendant kill John Sohus, not only does all the evidence indicate that he killed Linda Sohus, not only does all of the evidence indicate that both of these people are dead . . . . [¶] . . . [¶] . . . Not only did he end these two people's lives, it's sad that they're going to have the gall to come in here and blame the very woman they killed. [¶] Not only did he repeatedly bludgeon John Sohus over the head, they're going to come in here -- they did so throughout this trial -- and with their words assault Linda over and over and over again. They're going to repeatedly batter her. [¶] They're going to tell you . . . she must be the killer. Just wait and see. . . . [¶] They're going to tell you that Linda is a mastermind. She kills her husband, plans it out, mails these postcards,

21

then disappears herself for 28 years. She's a mastermind. Just wait and see. This is what you've heard. This is what you're going to hear. When all evidence in this case points you to the fact that there's only one person who's a mastermind. Not Linda."

Defendant did not immediately object that the argument constituted misconduct. The following morning, when the trial resumed, defendant objected to the prosecutor's statements that defense counsel had the "gall" to blame Mrs. Sohus for her husband's murder. Counsel objected on the basis that the remark was "inappropriate," and that the remark implied that "defense lawyers don't have a right, essentially, to present a zealous and effective defense. . . ." The prosecutor stated his view that the argument was not improper, and the trial court agreed that the remarks were permissible argument, and noted the objection for the record.

Initially, respondent contends that any claim of error was forfeited due to counsel's failure to make a timely objection, or to seek an admonition to the jury. A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, he objected to the misconduct and requested that the jury be admonished to disregard the impropriety. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072; see also *People v. Mickle* (1991) 54 Cal.3d 140, 187 [belated objection does not preserve a claim of error for appellate review].) An exception to the rule is that "a defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*People v. Hill* (1998) 17 Cal.4th 800, 820; *People v. Noguera* (1992) 4 Cal.4th 599, 638.)

Defendant did not timely object or seek an admonition, and we can find no basis for concluding that a timely objection or request for an admonition would have been futile, or could not have cured the alleged misconduct. Defendant urges that a timely objection would have been futile, as the court ultimately concluded the argument was permissible. We are not persuaded. A ruling on a belated objection is not suggestive of how a judge may have ruled had a proper and timely objection been made. (See, e.g., *People v. Simon* (1927) 80 Cal.App. 675, 679.)

22

In any event, defendant's claim fails on its merits. " ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214; see also *People v. Espinoza* (1992) 3 Cal.4th 806, 820.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Espinoza*, at p. 820.) "Included within the deceptive or reprehensible methods . . . held to constitute prosecutorial misconduct are personal attacks on the integrity of opposing counsel." (*People v. Gionis*, at p. 1215; see also *People v. Sandoval* (1992) 4 Cal.4th 155, 184.)

Here, the prosecutor was not denigrating defendant's counsel. When the remarks are viewed in context, it is clear that the prosecutor was arguing that defense counsel's *assessment of the evidence* was absurd. Such comments are well within the permissible scope of argument. (*People v. Gionis*, *supra*, 9 Cal.4th at p. 1218.)

## III. Weapons Enhancements

The jury found true that defendant used two deadly and dangerous weapons in the murder of Mr. Sohus. (Pen. Code, § 12022, subd. (b)(1).) When sentencing defendant, the trial court imposed two 1-year enhancements. Defendant contends, and respondent concedes, that only one enhancement may be imposed.

Penal Code section 1170.1 provides that when two deadly weapon enhancements apply to a single crime, only one enhancement may be imposed. (See Pen. Code, § 1170.1, subd. (f); Stats. 1982, ch. 1551, § 1.5; see also *People v. Espinoza* (1983) 140 Cal.App.3d 564, 566.) The proper remedy is to stay one of the enhancements. (*People v. Espinoza,* at p. 567.)

## IV. Custody Credits

Defendant next contends that he is entitled to additional custody credits. Defendant was arrested on July 6, 2011 and was sentenced on August 15, 2013. At sentencing, the trial court failed to calculate defendant's custody credits, and instead

23

directed the clerk to "calculate the amount of time that the defendant has actually been in custody and apply it to the abstract." The clerk calculated 771 days of custody credit, and awarded defendant no conduct credit.

Defendant points out, and respondent agrees, that there are 772 days between July 6, 2011 and August 15, 2013. Moreover, it appears the clerk applied Penal Code section 2933.2, which bars defendants convicted of murder from receiving local conduct credits under Penal Code section 4019. (See § 2933.2, subd. (c).) However, section 2933.2 was not operative until *after* the instant offense was committed. (See Stats. 1996, ch. 598, § 3; Stats. 1997, ch. 413, § 3; Stats. 1997, ch. 413, § 1; see also *People v. Flores* (2009) 176 Cal.App.4th 1171, 1182 [the limitations of section 2933.2 are inapplicable to crimes committed before its effective date].) Accordingly, respondent agrees that defendant was entitled to presentence conduct credits, accruing at a rate of two days for every four days served. (See former Pen. Code, § 4019, Stats. 1982, ch. 1234, § 7.)

However, respondent maintains that defendant erroneously received a "windfall" of custody credits for time he was in custody for another offense, and that his custody credits must be recalculated. We agree.

It is the trial court's obligation to calculate the number of custody credits a defendant is entitled to. (*People v. Culpepper* (1994) 24 Cal.App.4th 1134, 1138.) An unauthorized sentence may be corrected at any time, without the need for an objection below, even if the new sentence is more severe than the original sentence. (See *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6; see also *People v. Price* (1986) 184 Cal.App.3d 1405, 1411-1413.) Penal Code section 2900.5, subdivision (b) provides that custody credit "shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted." (See also Stats. 1980, ch. 297, § 1.) A defendant is not entitled to custody credit for time served in custody for which defendant was *simultaneously* serving a term for an unrelated offense. (*In re Rojas* (1979) 23 Cal.3d 152, 156-157; see also *People v. Bruner* (1995) 9 Cal.4th 1178, 1180.)

24

Defendant's probation report discloses that defendant was convicted in Massachusetts of kidnapping and assault with a deadly weapon on June 12, 2009. He received a prison sentence of four to five years. Defendant was arrested in this case on July 6, 2011, while he was serving his Massachusetts prison term. During sentencing, the prosecutor noted that he had "received from the Commonwealth of Massachusetts, Department of Corrections, a Certificate of Release. [¶] . . . the State [of California] had borrowed [defendant] from the Department of Corrections in Massachusetts. He was serving a sentence there when this trial began, and I have a Certificate of Release here from them, indicating that, in accordance with their laws, he has been released from further imprisonment as of July 12, 2013, and that he should remain in the custody of California authorities." According to the trial court's minutes, the court received a copy of the Certificate of Release from the prosecutor, but it does not appear in the appellate record.

The record makes clear that defendant was simultaneously in custody on the Massachusetts matter from July 6, 2011 (his arrest in this case) until he was released from his Massachusetts prison term. Therefore, defendant was not entitled to accrue custody credits for this case during this time. (See *In re Rojas*, *supra*, 23 Cal.3d at pp. 156-157.)

However, we are not satisfied that the record before us is adequate to calculate the amount of credit defendant is due, as it does not include the Certificate of Release from the Massachusetts Department of Corrections. Remand is necessary for the trial court to properly determine how many credits defendant is entitled to, including conduct credit. (See, e.g., *People v. Fares* (1993) 16 Cal.App.4th 954, 957-959.)

## V.     Parole Revocation Fine

Lastly, defendant contends the imposition of a $10,000 parole revocation fine was improper, because the statute authorizing the parole revocation fine, Penal Code section 1202.45, was not enacted until after his offense was committed. (See Stats. 1995, ch. 313, § 6.) Respondent concedes the error, and we agree that the fine is improper. (See *People v. Callejas* (2000) 85 Cal.App.4th 667, 678 ["applying section 1202.45 to [a

defendant], whose underlying crime preceded the enactment of that statute, would violate ex post facto principles"].)  Accordingly, the fine must be stricken.  (*Ibid.*)

## DISPOSITION

The judgment is affirmed in part and reversed in part.  One Penal Code section 12022, subdivision (b)(1) enhancement is stayed, the parole revocation fine is stricken, and the case is remanded so that the superior court may determine the number of custody and conduct credits to which defendant is entitled.  The superior court is directed to prepare an amended abstract of judgment, and shall forward a certified copy of the same to the Department of Corrections.  In all other respects, the judgment is affirmed.


GRIMES, J.

WE CONCUR:

FLIER, Acting P. J.


OHTA, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.